THOMPSON, Presiding Judge.
A.T. (“the mother”) appeals two judgments of the Houston Juvenile Court (“the juvenile court”) finding two of her children, An.J.T. (“the son”) and Am. J.T. (“the daughter”), dependent and transferring custody of the son and the daughter (hereinafter referred to collectively as “the children”) to their paternal grandmother, A.G. (“the paternal grandmother”).
The record on appeal indicates that the mother and the children’s father, C.T. (“the father”), have never married; the record does not clearly indicate if the parents have lived together as a couple. The mother has another child, As.T., from a previous relationship; that child was 10 years old at the time of the dependency hearing, and she lived with the mother. Pursuant to an agreement between the mother and the father, the son, who was eight years old at the time of the dependency hearing, has lived with the father since he was two years old. In 2009, the father and the son moved to Indiana. The paternal grandmother testified that the father had used illegal drugs in the past, and she stated that the father’s move to Indiana was prompted by his desire to remove himself from influences that encouraged him to use illegal drugs.
The mother testified that, until June 2010, she had maintained custody of the daughter since the child’s birth in 2004; the daughter was six years old at the time of the dependency hearing. In June 2010, the electricity at the mother’s residence was disconnected, and the mother took the daughter to the home of a paternal great-aunt; the great-aunt is the paternal grandmother’s sister.[1] The mother testified that she intended that the daughter remain with the great-aunt on a temporary basis.
The paternal grandmother testified that the great-aunt asked her to take the daughter after the mother had left the child at the great-aunt’s home in June 2010. According to the paternal grandmother, the daughter was extremely dirty when the mother left the child with the great-aunt; the mother denied that allegation.
The paternal grandmother testified that the daughter lived with her until August 2010, when the father returned to Alabama from Indiana. The paternal grandmother testified that between June and August 2010 the mother telephoned only three or four times to check on the daughter and that the mother visited the daughter only one time. The mother testified, however, *387 that the daughter lived with the great-aunt until August 2010.
It is undisputed that, when the father and the son returned to Alabama in August 2010, the daughter began living with the father and the son in the great-aunt’s house. The mother testified that she had allowed the daughter to live with the father because, she stated, the daughter had expressed a desire to do so. The paternal grandmother, however, testified that the daughter had been living with her and that she had allowed the daughter to live with the father.
The paternal grandmother testified that the father has a history of mental illness and that he was diagnosed with bipolar disorder when he was 16 years old. In November 2010, the father was admitted for approximately one week to the Behavioral Medicine Unit (“BMU”) at a local hospital because of an apparent overdose of illegal drugs. Shortly thereafter, the paternal grandmother filed her petitions alleging that the children were dependent and seeking custody of the children.
Since the paternal grandmother filed the dependency petitions on December 7, 2010, the father has continued to experience problems. The father was readmitted to the BMU around Christmas 2010, and again shortly before the March 10, 2011, dependency hearing. The paternal grandmother testified that the father does not have a home of his own but has stayed with friends and family members. The father did not testify at the dependency hearing, but his attorney represented to the court that the father wanted the children to live with the mother.
In her dependency petitions and in her testimony, the paternal grandmother alleged that the mother was not financially capable of meeting even the children’s most basic needs. The paternal grandmother testified that the mother did not work and had no means of supporting the children.
The mother testified that she last had employment in 2005. The mother stated that she becomes nervous around groups of people. According to the mother, her doctor had diagnosed her as having a “social anxiety,” for which she has been prescribed medication.
The mother lives in rent-free public housing with As.T., and she receives food stamps each month. The mother testified that she occasionally babysits or helps clean houses, for which she earns “maybe $250” per month. The mother acknowledged that she has no other income, and she stated that she relies upon her mother and other family members for support.
The mother was arrested at a December 2010 court hearing because of her failure to pay $100 monthly toward restitution for numerous bad-check charges dating back almost 10 years before the dependency hearing. The mother stated that her mother would pay the $100 court fines each month because, the mother said, her mother gives her anything she wants.
The mother acknowledged that she had not contributed to the support of the children during the times they had lived with or been in the custody of the paternal grandmother. The mother testified that, although the daughter was no longer living with her, she continued to receive food stamps for the daughter until December 2010. The mother stated that she had used some of the food stamps she received for the daughter to assist the father in providing food for the children after they began living with him in August 2010.
The mother does not have her own transportation. The paternal grandmother testified that the mother must telephone family members for assistance if she needs to take the children to visit the *388 doctor or to obtain medications for them. The mother admitted that As.T. missed at least six days of school in January 2011 when the child missed the school bus; the mother had no other means of transporting the child to school. The mother stated that she was trying to move from her residence during that time and that “it was just hectic in January.” The mother admitted that she got a letter from the school concerning the number of As.T.’s absences in January 2011.
Hazel Wiggins, a Department of Human Resources (“DHR”) social worker who conducted home evaluations on the parents and the paternal grandmother, testified that when she met with the mother in February 2011 she advised the mother that she could apply for Social Security disability benefits and that she could explore certain job programs through DHR. The mother stated during the March 2011 dependency hearing that she planned to explore those options.
Wiggins also testified that the mother’s home was physically appropriate for the children and that there were no reports of abuse or neglect of the children by the mother. However, Wiggins stated that DHR had concerns about the mother’s ability to meet the needs of the children. Wiggins testified that she was concerned that adding two additional children to the mother’s home would place stressors on the mother. Wiggins also testified that it did not appear that the mother could financially afford two additional children in her home. For those reasons, Wiggins recommended against placing the children in the mother’s home.
In addition to the concerns about the mother’s financial ability to meet the basic needs of the children, the paternal grandmother presented evidence indicating that the children had been out of the mother’s custody for an extended period and that the mother had not kept in frequent contact with the children. The son has lived with the father since 2002, and the mother admitted that she had chosen for the daughter to live with family members between June and December 2010. The paternal grandmother testified that the mother had visited the daughter only once during the summer of 2010 and that she had telephoned the daughter only three or four times during that same period. The paternal grandmother also stated that the mother had expressed little interest in visiting the children. According to the paternal grandmother, after she received pendente lite custody of both children in December 2010, the mother visited the children once in February 2010 and attended both children’s birthday parties. The paternal grandmother also stated that she had telephoned the mother and had offered to allow her to take the children for some time at Christmas; she stated the mother had visited with the children from noon to 6:00 p.m. on Christmas day.
The mother explained her failure to visit the children more frequently by stating that her oldest child, As.T., became upset when the children had to leave after a visitation and that she did not like to hurt As.T. The children’s guardian ad litem expressed concern regarding the mother’s “nurturing ability,” given the fact that the mother “didn’t pay [the children] more attention when they weren’t with her.”
In each of its March 11, 2011, dependency judgments, the juvenile court stated, in pertinent part:
“Based upon clear and convincing evidence, the court finds that the child is dependent in that the parents are unable to provide for the child’s care, support, and education at this time. It is recommended that the parents participate and cooperate with individual and family counseling and parenting classes. The *389 parents should look into pursuing disability [benefits]. The parents shall be provided reasonable visitation with the child.”
The mother argues on appeal that the evidence does not support the juvenile court’s determinations that the children are dependent. With regard to the standard this court applies in reviewing a dependency determination, this court has stated:
“A finding of dependency must be supported by clear and convincing evidence. [Former] § 12 — 15—65(f)[, Ala. Code 1975 (now codified at § 12-15-310, Ala.Code 1975)]; M.M.S. v. D.W., 735 So.2d 1230, 1233 (Ala.Civ.App.1999). However, matters of dependency are within the sound discretion of the trial court, and a trial court’s ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. R.G. v. Calhoun County Dep’t of Human Res., 716 So.2d 219 (Ala.Civ.App.1998); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App.1997); and J.M. v. State Dep’t of Human Res., 686 So.2d 1253 (Ala.Civ.App.1996).”
J.S.M. v. P.J., 902 So.2d 89, 95 (Ala.Civ.App.2004). “Moreover, ‘[b]ecause the trial court has the advantage of observing the witnesses’ demeanor and has a superior opportunity to assess their credibility, this Court cannot alter the trial court’s judgment unless it is so unsupported by the evidence as to be clearly and palpably wrong.’ ” Ex parte Fann, 810 So.2d 631, 636 (Ala.2001) (quoting Ex parte D.W.W., 717 So.2d 793, 795 (Ala.1998)).
The mother argues that there is not clear and convincing evidence indicating that she lacks the financial resources to support the children. The mother characterizes the evidence indicating that she could not provide for two additional children in her home as “speculative.” Given the evidence in the record on appeal, we cannot agree with that characterization. The mother herself testified that she had not been employed since 2005 and that she occasionally earns $250 per month in income as a babysitter or a housecleaner. The mother acknowledged that she relies on family members for much of her support and to pay her court fines. The mother points out that she may qualify for Social Security disability benefits or for assistance through a jobs program; however, at the time of the dependency hearing, the mother had not explored those options. Therefore, those possible sources of income were not available to the mother at the time of the dependency determination. At the conclusion of the dependency hearing, the juvenile court indicated that it believed that the mother’s financial situation could improve such that the children could be placed in her home in the future but that, at that time, she was unable to meet the children’s needs. The mother has failed to demonstrate that the evidence in the record does not support that determination.
Further, the mother admitted that she elected to allow the children to live with other family members for extended periods. The mother also acknowledged that she had failed to regularly visit the children, citing the distress experienced by her oldest child when the children left as a reason not to visit the children. The children’s guardian ad litem expressed concern that the mother had failed to regularly visit the children. Given the presumption in favor of the juvenile court’s judgment, see Ex parte Fann, supra, we cannot say that the mother has demonstrated that the juvenile court erred in determining that the children were dependent.
*390 The mother also argues that the juvenile court erred in failing to award her a set schedule of visitation with the children. We agree. This court has explained:
“ ‘[T]he determination of proper visitation
“ ‘ “is within the sound discretion of the trial court, and that court’s determination should not be reversed by an appellate court absent a showing of an abuse of discretion.” Ex parte Bland, 796 So.2d [340] at 843 [ (Ala.2000) ]. “The primary consideration in setting visitation rights is the best interest of the child. Each child visitation case must be decided on its own facts and circumstances.” DuBois v. DuBois, 714 So.2d 308, 309 (Ala.Civ.App.1998) (citation omitted).’
“Williams v. Williams, 905 So.2d 820, 830 (Ala.Civ.App.2004).
“Although this court recognizes that visitation is a matter left to the sound discretion of the trial court, such discretion is not unbounded. This court has previously held that it is reversible error for a juvenile court to leave the matter of a noncustodial parent’s visitation rights to the sole discretion of a custodial parent or other legal custodian of the child. See, e.g., L.L.M. v. S.F., 919 So.2d 307 (Ala.Civ.App.2005) (reversing a juvenile court’s visitation award that placed the father in control of the mother’s visitation with the child), and TLB. v. Cleburne County Dep’t of Human Res., 897 So.2d 379 (Ala.Civ.App.2004) (reversing a juvenile court’s visitation award that essentially conditioned the mother’s right to visitation with her child upon the consent of the child’s aunt and uncle); see also D.B. v. Madison County Dep’t of Human Res., 937 So.2d 535, 541 (Ala.Civ.App.2006) (plurality opinion reversing a juvenile court’s judgment that made the mother’s visitation ‘ “subject to any conditions and limitations deemed to be necessary and appropriate” ’ by the child’s great aunt, who was awarded custody of the child).”
A.M.B. v. R.B.B., 4 So.3d 468, 471-72 (Ala.Civ.App.2007) (concluding that “the juvenile court in this case erred in failing to set forth a specific minimum visitation schedule,” id. at 472).
The juvenile court awarded the mother only “reasonable visitation” with the children; it failed to set forth a specific minimum visitation schedule. Accordingly, we reverse those portions of the March 11, 2011, dependency judgments pertaining to visitation, and we remand the causes for the juvenile court to enter orders setting forth a specific visitation schedule. A.M.B. v. R.B.B., supra.
2100591 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
2100592 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in part and concurs in the result in part, with writing.

. The great-aunt is referred to in the record simply as “Ms. [K.].”